Case number 11-0875, Gerardo Solis v. BASF Corporation Good morning gentlemen. If you would please identify yourselves for the record. I have been signing up to help Gerardo Solis be an athlete. Thank you. Your name is John Skolnick, BASF Corporation. Good morning. And Mr. Skolnick, please proceed. Thank you, Your Honor. If it pleases the Court, again, my name is John Skolnick. I represent the appellant in this case, BASF Corporation. There are a multitude of errors in this case. We've laid them all out in our brief, and I don't think we'll have time to touch on all of them. So I want to highlight the three that I think are most critical for the judgment notwithstanding the verdict motion, the denial of that motion below. Can you address the impact that counsel argued of the decision not to or to accept a general verdict form, which raises questions about whether there is any way to ascertain whether some of these perceived errors on your part had any impact? We really don't know what ground the jury used, which of several alternative grounds the jury used in coming to their verdict. Sure. I can address that. You have three fundamental issues, at least, that cut across the entirety of the general verdict. Which you've kind of put into your recidivism. Go ahead. Tell us about those three. That's right. One is the statute of limitations issue. If the court had ruled properly on the statute of limitations issue, we would never have gotten to a jury. This case would have been decided at least by the close of the evidence, but it would have never gotten to a jury. There's undisputed proof that the statute had run by the time the BASF Corporation was sued in the amended complaint in this case. So that takes the general verdict issue out. Weren't there factual issues that arguably, even under your theory, could have determined the statute of limitations issue? I understand that that would be enough, if there were, to have prevented the issuance of summary judgment against you on that. But wouldn't you concede that there were some factual issues that need to be determined? I mean, for example, the quote to the note in Dr. Sherman's record that the plaintiff didn't recall making, and wouldn't that be a factual determination in and of itself? That's one piece of evidence of many things that occurred in 2004 that would have started the statute running at that point. Before 2004. Before the end of 2004. Before the end. That's correct. Going back to your initial comment, there's two other points that you wanted to make regarding how it cut across all lines. One of them, one other, is that there was no testimony establishing that the amount of diacetyl that was provided by BASF through a distribution process as opposed to its own manufacturing, was this amount that Mr. Solis testified to from some notes that he read. But one of your arguments is that there's no testimony establishing actually how much of diacetyl he was exposed to  Isn't that one of your other points? One is causation. And there are two issues with respect to causation. And what are they? One is the issue of not having read the instructions, the warnings that were provided by BASF Corporation. Essentially, this is a warnings case. In Mr. Solis' brief, he talks about five or so independent claims. He calls them failure to warn, failure to disclose, negligent failure to warn, negligent failure to disclose. And then he's got this design defect that he says went to the jury. There was no evidence of design defect. And frankly, it doesn't make any difference if you call the theory failure to warn, failure to disclose, negligence. It all boils down to the same thing. How would the plaintiff go in this case? One of the things you are critical of is the failure of the doctors to provide testimony that the amount of diacetyl caused his injury. Now, how would you say the plaintiff is supposed to establish that other than the way it was presented in this case? Well, there's plenty of ways to establish it. There are coworkers that worked with Mr. Solis. They were not called in the case to talk about where did the diacetyl come from. I'm sorry. I've just been calling it diacetyl solution. I'm sorry. I'm just reading it. I don't know how to pronounce it either. I put it different ways. Were there records or could there be records available that would actually detail the amount of the product? There were records. That was the point of the examination of Mr. Solis and of others who came, of the president of Flavor Cam where he worked. The records say very clearly for a period of time, for some period of time the records indicate that diacetyl was used, but don't tell you in what formula necessarily and doesn't ascribe a name to that. In the later records, this is 2002 to 2006 roughly, there are records of the company that say with respect to a particular batch made, BASF Corporation or somebody else's diacetyl was used with respect to that batch. And we asked Mr. Solis, well, on any of these, did you use BASF diacetyl? And he can't tell you whether he made that batch or not. Does that create at least a factual issue for a jury to determine? You have testimony from expert witnesses that the exposure that he would have had would have been sufficient to be a substantial cause. We have the records such as they are. We know that the substance, we'll call it so I don't mispronounce it, is present in the plant at a time when he is working on activities that would cause him to come in contact, at least arguably, with that substance. Doesn't that create at least an issue of fact that the jury is entitled to decide? You've got to have something more, Your Honor, than just the fact that he's in the plant at the same time that the material is. Well, isn't there plenty more than that? Isn't it that he's in there doing a job that would cause him to be in contact with it, that at least during the period of time that he's working there, your company is selling it, it becomes a not insignificant amount or percentage of what is in the plant at that period of time. Isn't it rather a stretch to say that that fully falls short of causation evidence that the jury is entitled to consider? I don't think so, and here's why. Here's what his expert said. When asked on cross-examination, can you tell us at any point in time whether or not he was exposed to BASF Corporation diastole? His answer is, I can't tell you. I can't tell you what the concentration was. I can never tell you. And, in fact, he comes up with the conclusion. Who would ever be able to supply that type of information? It's done all the time, Your Honor. Experts come in. They had experts in the plant from National Jewish Hospital to take readings. Don't purchase orders, don't inventory. All those things indicate from where substances are purchased, by whom, when, how much was paid. I'm sorry, Your Honor. We don't deny that BASF Corporation diastole was there. We don't deny that it was in the plant that they purchased it. But the problem is you can't link up that diastole with the plaintiff in any circumstance. There's no way to get him in the same room with that diastole at any point in time. So let's just take hypothetically a situation where three entities are shooting poison into the air in a closed environment. You're saying that under those circumstances, to take the logical extension of your argument, unless you show who's directly, I only ingested Company A's poison, that the jury can't make a determination? Your fact situation, Your Honor, is a little different. It's kind of interesting. You're saying we know that while a plaintiff is in a room, somebody is shooting poison into that room. We don't even know that in this case. And you know what's interesting? Well, he's in a plant, and he's in a plant where this substance, which experts have said caused the bronchiolitis obliterans, is being used. He is diagnosed with bronchiolitis obliterans. And your company supplied some percentage of the substance that causes that disease. So it's not that far-fetched to say that it's almost an impossible burden for someone to say. I mean, if you said it was there one day, you come up with the argument, well, somebody else's substance was there three days. At some point, we have to say to the jury or the trier of fact, here are the facts you are entitled to determine from these facts whether this substance caused a substantial damage to the individual. And I would agree with you. There is some point at which you do have to say that to the jury. The question is, what's the point? When do you cross the threshold that would allow you to do that? Now, Mr. Solis said, for instance, a substantial and overwhelming part of my time was spent making vanilla ice cream flavor. Well, we can go to the record, so we can look at the rest of the company, and we can see what specifically was used with respect to making vanilla ice cream flavor. Whose company's diastole was used there? And it tells you. It was Polaroom. It's another supplier. It's not BASF. So there are lots of ways that the plaintiff can come forward and say, I know I was working, I was making some particular substance on a day. You look at the records, and you can link it up. You could have a co-worker come in. The problem is the case law doesn't permit you just to say, okay, it's in the building at some point in time, and the plaintiff is in the building at some point in time. You've got to have a little more than that. And the problem here, and I think the plaintiff recognized the problem. Their expert came in and said, look, BASF Corporation can be liable irrespective of whether there is exposure to its own diastole. That's very telling. What was that comment you just referenced? Dr. Eagleman said there is liability for BASF Corporation whether or not there is exposure to its diastole. That's telling. That tells me that there is no proof, and there can't be any proof in this case. Did you object to that comment and was it stricken? No, it wasn't stricken. It was done in cross-examination. Oh, you asked. I asked him is it possible, are you telling the jury that BASF can be liable irrespective of exposure to its diastole. His answer is yes. I'm curious as to why you're asking a doctor a legal conclusion on whose liability it is, other than trying to impeach the credibility of that witness, which maybe you were successful in doing, but how does that really affect anything we're now arguing? Ninety percent of his testimony was testimony in the ultimate facts of the case. What about the statute of limitations? You indicate that Mr. Solis indicated in 2004 he told his doctor he believed he had an occupational injury. Correct. And the trial court did not allow this testimony at all. It had already barred the statute of limitations defense. Correct. Well, the trial court allowed us to inquire about what he told the doctor. The trial court refused to allow us to put the document in in order to impeach him on the basis of the document. Well, was the doctor deceased? No, the doctor was not deceased. But the law says that you can examine a claimed injured party on the basis of statements made in doctor's reports and doctor's records. Why don't you tell us why your statute of limitations should have resulted in the judgment not standing? Well, by 2004, Your Honor, based not only on what he told Dr. Sherman, but what the conversations that he had with Dr. Rose from National Jewish Hospital, who came to the flavor plant in 2004 to do an evaluation of the worker's exposure to butter flavorings, including diacetyl, and what he was told by her at that point in time, which was, you have an occupational injury and you're incapable of wearing a respirator because your lung problem is so bad because of the environment here. At that point in time, he was on inquiry. Where was the line, because of the environment here? I'm sorry? You just put in the clause, because of the environment here. Because of what you're breathing in the air. Warren, what's your question? I'm sorry. Didn't multiple doctors say that he was misdiagnosed multiple times? They were telling him he had asthma, but, in fact, he was already suffering from the injury? The experts talked about the fact that, at least as of 1989 or 1990, before he came into contact with BASF product, he was already laboring with this disease, bronchiolitis splitterans, and the experts said that people who had seen him before, who had diagnosed him with asthma, were misdiagnosing him. The problem is, Your Honor, it doesn't make any difference what specific name you give to the disease. The cases have never turned on what the actual diagnosis is. The cases have always turned on, do you know you have an injury? Are you put on adequate notice to inquire further? That's exactly right. By the end of 2004, it was clear that he had adequate notice to inquire further, and the statute should have been running from that point in time. The questionnaire, were you able to get that in? The questionnaire, we were not able to get in the questionnaire. So you weren't able to get in your statute of limitations either? Well, it never went to a jury. We attempted to put on some evidence of knowledge that he had knowledge, but the issue never went to the jury, which, while we think that it's a J&OB issue, because it was so clear, at a minimum, it's a new trial. So those were two of the grounds that we said were the basis for a J&OB, the statute of limitations, absence of causation. Let me just come back to the other issue on absence of causation, if I can. There's no doubt that Mr. Solis didn't read the material safety data sheet that had BASF's warnings on it. And about that, I think his explanation when he was asked about that was, I've worked with this material before, and so I didn't think that there was anything that I needed to read again. Wasn't that, in essence, what he was saying? He said that over the course of several years he had worked with diacetyl and other chemicals. He had read some MSDS before he came to Flavor Chem, and he didn't really need to read anything. But aren't we really engrafting on that explanation a speculation that if, for example, and we now cross into the other issue of whether or not the knowledge of the report from 1993 by the parent corporation that you referred to as AG can be imputed to BASF Corporation. If, for example, that was knowledge that was given and was acted on, we're assuming, aren't we, that the employer wouldn't say, well, we have some new information on this substance that we're using, and not only are we going to be changing our ventilation and our respiration policy, but you might want to read this now that we have this new information. I mean, you're really assuming that there'd be nothing more done than handing out another piece of paper without any type of drawing attention to it, aren't you? No, not exactly, Your Honor, and here's why. There was a person at Flavor Chem who was charged with reviewing material safety data sheets of various suppliers and writing their own. The BASF Corporation material safety data sheet had reference to new information. It was the only one that had reference to new information, and that information was a reporting of the results of this LC50 study, the 1993 study, reported clearly in the MSDS, and alongside that it says the product is moderately toxic. Well, that was something that was not only available to the employer, but was seen by the employer. The employer, for whatever reason, a lack of appreciation of it or whatever, whatever the safety person decided to do with that information, I can't tell you, but it never was brought to anybody's attention. Maybe the word moderately threw them off the game. Well, I don't know. Mr. Solis probably wouldn't think that the injury is a moderate one. Well, but the moderate, I mean, there's testimony as to where moderate comes from. The term moderate is something that is the function of the test result. So if the test result falls within a certain range, that's a product that's moderately toxic, as opposed to falling within a higher concentration, which would be a lower toxicity, or a smaller concentration, which would be a highly toxic product. So that's a function of classifications that are established not by BASF, but by others. And that's basically what the test is capable of doing, is giving you a range of toxicity. It doesn't tell you anything about what happens in humans, and it's not intended to tell you what happens in humans. What was the court's rationale for allowing the information about the 1993 study by the German? I don't want to make a floor here, but you tell me. What was her briefing for allowing that to go to the jury as something that was the same knowledge as your court? I don't know what the question was. I wish I knew what the rationale was, because we argued, and we in fact filed motions directed to making sure that the separateness of the parent and the subsidiary were recognized because they are two separate companies. And there was a constant effort at the time of trial to blur, as you would expect, to blur the distinction between the two. And in fact, at one point Dr. Eagleman was going to testify, was offered early on to testify about his analysis of corporate records, and the judge at least excluded that and said Dr. Eagleman is not an expert on corporate relationships. But he did manage to slip in some things about BASFAG as well. The final point that I think cuts across the JNOB issue is this question of the imposition of a duty that we've never seen in this state at all. It's the duty to warn, what we call the duty to warn the world. Isn't that hyperbole though? Well, Your Honor, maybe so. Maybe we took some liberty. But it's certainly a duty to warn the industry. There's no question about that. It struck me as just a half step respectfully above the gratuitous comment about the terms of Mr. Solis' leaving his prior employer, which I could see no relevancy at all except to throw some mud in the game. Well, we have some questions about some of this credibility. And for the life of me... Well, how does that factor into any of the appellate issues? It doesn't, Your Honor. Other than this question of his last minute calculations, which we have some problem with. Different issues. That's right. All right. So the question of... I just blanked on your question. That's okay. But I apologize for taking you off of that. But you were speaking about the issue of the... Of the duty. Right. The imposition of the duty. The world. Yeah. Oh, that's right. And you asked me, you know, was it excessive? It certainly is a duty to warn the industry. And that's a duty... Or is it a duty to warn the people who buy the product and use the product? Well, that's because... Isn't that what's going on there? That might be right. If you can establish that BASF Corporation sold to Olmert, sold to people who sold to Olmert, or sold to people who sold to Flavors of North America, these were prior employers, at a time when Plaintiff was working there. That might make sense. But that's not what occurs here. And again, they need this kind of flexibility in terms of timing because you can't prove causation in this case. So what do you do? You've got to look to an earlier time and try and establish some linkage, no matter how attenuated, between BASF Corporation and... I won't even say Mr. Solis because I don't think there's any relationship established with respect to Mr. Solis, but with respect to those suppliers. There's no proof of it in the case, and it doesn't bear the theory out. And in fact, I don't see a single case that's been decided by the courts in this state that would permit this kind of a theory, certainly on this record. So I think that, again, that's another issue that cuts across the entirety of all of this. All right. Are you going to touch on your other claims in terms of the new trial, these would be the instructions and the statute of limitations or what else? I can, Your Honor, but if you want, there are 15 of them. What would you highlight? Well, certainly the statute of limitations issue is one. What would you highlight? Well, let's talk about the ones that I think are most critical to the plaintiff's argument before the jury, and one is the fact that they put on evidence of a 2006 change in the material safety data sheet. That's highly... But wasn't that done for knowledge? No, it was... They had this information and didn't disclose it earlier? No, I actually think that was put on primarily to challenge a position that nobody at BASF Corporation or any of the experts we put on took, and that is that diastole does not, under any circumstance, cause bronchiolitis obliterates. And so they put on the subsequent revision of the material safety data sheet to say, wait a second, they can't take the position that it doesn't cause bronchiolitis obliterates. Look at the 2006 revision. Wasn't there a statement made about whether it was something from asthma or the bronchiolitis obliterates? Wasn't there some suggestion? Sure. Yes, there was suggestion by our experts that they couldn't tell you whether or not he was suffering definitively from bronchiolitis obliterates or asthma. Well, as a general rule, remedial measures aren't allowed, but if you're taking the position and your defense conflicts with the idea that they're trying to present, the court can allow that information. Well, we never took the position, Your Honor, that bronchiolitis obliterates is not caused by diastole. What our experts said was that they didn't... Didn't you sort of argue that, pardon the pun, the jury was still out on whether or not this causes... That's correct. ...disease? That's correct. And there's nothing inconsistent. Well, is that a defense? I mean, that was your defense part of it. You had multiple theories going. That's right. So, does the court abuse... Are we looking at this court abuse of discretion? On... Particular ruling? With respect to that, yes. Yes. And... Absolutely. ...could the court in her discretion have concluded that your position, that this doesn't cause or that the jury's still out on it, conflict with the 2006 change in the... That might be the case, Your Honor, if it conflicted. There's no conflicting statement made in the later MSDS. The MSDS says it may be associated with bronchiolitis obliterans. It doesn't say it causes bronchiolitis obliterans. Isn't that really, you know... That's pretty close to the bone. At least under those circumstances, you know, the plaintiff is entitled, isn't he, to say at that point, Well, they're saying that this isn't what I have, but it's in the plant. I have a pulmonary disease, and guess what? This is... These people are acknowledging that their item might cause this. I mean, it gives them at least an argument they could make that would say to the trial judge that it's not an abuse of discretion to let that fact come in and let the jury weigh it however it chooses. If that's the way it had been played, maybe you're right, Your Honor. The problem is it wasn't played that way. It was played as if there was an admission that was made in the later MSDS. In that case, you're objecting to the argument that the plaintiff's made and not the admission of the evidence. Well, I'm objecting to the admission of the evidence because I don't think the evidence is impeachment. But if your real objection is to how it is played, did you object to that argument being made in closing argument? I objected to the admission of the documentation. I don't know if I objected at closing. But see, if that's the real objection, then we have a forfeiture issue on that. You're right. I understand. Give me a little information on how his calculations came about. Well, Mr. Solis was examined over the course of several days in a disjointed way because of other scheduling issues. So some of his testimony went in one day. Other witnesses came in and testified. On the following cross-examination where he admitted that he could not tell what diacetyl he had worked with and whether he'd ever worked with anything from BASF, on re- maybe redirect or re-redirect at that point, he was asked about whether or not he had figured out what he had been exposed to. Stop doing that, counsel. You're too good for that, I'm sure. The head shaking doesn't help. I'm not talking to you, Mr. Skolnik. He had figured out whether he had figured out what he had been exposed to and what he had worked with. And he said, yes, I have. I happen to have in my pocket a series of, you know, a page of calculations that I made just the other day. And he pulled it out and he said, well, you know, it looks like I worked with 50% BASF diacetyl, which would have been hard to believe under any circumstance, but that's what he did. And he said, well, the reason he was able to figure that out is because somehow out of all the boxes of documents that were in the courtroom, one document appeared on counsel table that was some sort of an inventory worksheet that showed how much diacetyl had been purchased over some particular period of time. First time that the document had ever surfaced, this thing that was sitting on counsel table. So just cutting to the chase here, what was his conclusion as to the amount that he said he was exposed to that was BASF distributed or provided? He said based on his calculation, he was convinced at that point that he worked with 50% of BASF diacetyl. And you objected to that? Oh, yes. And it was a lie. Yes. I think the only other one that I want to highlight for you, unless you want to hear more, is the German MSDS and how that came into evidence. Because, again, that was something that was discussed at length during closing. It's an MSDS that was admitted into evidence over objection. No foundation was laid for it. No witness was called to testify about where it came from. It appears to be something that was made by BASF AG at some point in time. It was in our records and was produced during the course of trial, but not a single witness was able to tell where it came from, how it got there, and nobody from Germany was ever deposed in the case. So there's no evidence whatsoever that would establish a foundation for it. In addition... Didn't one of the employees of, I don't know which company it was, indicate that this kind of information would be something that would have been shared? Was there some sort of testimony about that? Not necessarily about that. There's testimony from several people at BASF Corporation about how they might be able to obtain information if they request information. And what was the instruction? Was there some sort of limiting instruction on this particular evidence or not? I seem to recall an instruction that was... Well, the instruction at some point was that it might not come into evidence. That was the instruction.  I'm allowing this to be shown to the jury. It might not come into evidence at the end of the day. Was there any instruction about how that evidence should be considered? No. Did you provide any instruction? No. I objected to its display, use, everything about it. And no explanation at all about what that document was, other than it had a different recitation of the warning. I know what that recitation is because I've looked at what the basis of that is. It's EU law and it has nothing to do with anything that's done to the United States under OSHA. But there was no testimony about it. Did their experts still rely on it as evidence for their opinion? Sure. So would it come before the jury that way? Well, but it would never be displayed to the jury in the way it was displayed to the jury and then admitted eventually into evidence in the case. Whether it was displayed or not, they would have heard it. And, I mean, is there really any legitimate argument to be made that the experts couldn't have relied on this in reaching their opinion? I think the experts can rely on all kinds of evidence. So I don't really see how you can argue at one point that it's proper for the experts to testify to basing their opinion upon this earlier MSDS, the German MSDS, as it's been referred to, and then at the same time complain that, well, seeing it, though, is somehow, you know, so egregious that there's an error. Well, Your Honor, I think seeing it and then making it the centerpiece, one of the centerpieces of your closing argument and saying this tells you that the U.S. MSDS is inadequate. Yeah. That's where the problem is. Well, the jury instructed in this case that the opinions of the experts, that the experts have the right to base their opinion on these other matters, but the jury is only to consider it as a basis of the opinion and not as substantive evidence? Not with respect to this document. Was that sought by you? I don't think I sought any limiting instruction. I sought to borrow it completely. Right. But once it was testified to, now it exists in the jury's mind, and the question is whether there was a limiting instruction sought. Your Honor, as I recall the record, I don't believe I asked for a limitation on that particular document because I thought the damage was done as soon as she allowed it to be published to the jury, and then the damage was repeated at the time of closing. All right. Anything further, Mr. Skolnik? Well, I don't think it's necessary to go through all the points of error with respect to the new trial. Suffice it to say that there are many, and while one alone might not be enough to get us to a new trial, the cumulative effect was to create a trial that was so full of prejudice that we are entitled to a new trial. But I come back to the premise of the argument in the beginning, and that is that J&OB is warranted in this case for the three primary reasons that I discussed earlier. If I could have maybe a minute at the end of Appelli's argument to wrap up, I may not even be able to do that. Well, you can see we're not staying strictly to time guidelines. I appreciate that, Your Honor. Thank you, Mr. Skolnik. Thank you. Mr. McClain, I'd be happy to hear from you. Thank you, Your Honor. I listened with interest to Mr. Skolnik's argument, and the point that the court began on I think is very important to come back to, which is under 2-1201 in Elam, if any theory submitted to the jury supports the jury's verdict, then the various complaints that are made here go by the wayside. Let's start with one that isn't affected by that, statute of limitations. That's fine, Your Honor, because I think that the court has keyed on this. In this district, and in fact a case that both you, Judge Epstein, and Judge McBride sat on, the Mitzias case, if I'm pronouncing that correctly, that was the case involving the pain pump, is very instructive on this issue and was very informative in terms of our arguments on the case, and the defendants didn't at all address it. But you said in that case that where a particular cause of action would not be discoverable through reasonable diligence, that particular cause of action should be told until that cause of action becomes discoverable. All right, let me then show why I don't think that is really applicable to this set of circumstances. Let me ask you. If he, being Mr. Solis, knew that he had a respiratory problem, incorrectly thought it was asthma, and if he knew or had reason to believe that that asthma, as he believed it to be, was caused by an improper act by another party, would the fact that nobody said up until that point, no, no, no, it's not asthma that's being exacerbated by this substance, it's really bronchiolitis obliterans, would that make a difference? In other words, he would still know or believe at that point that he had an injury that was wrongfully caused. Judge, if your recitation of the facts was the way that the evidence was presented in the case, I would agree that there might be an issue, and there could have been a submissible issue, if the defendant had not chosen to defend the case on the basis that bronchiolitis obliterans was not known to be caused by diacetyl, and likewise asthma was not. Well, that's not really, I think, a fair argument to make in terms of whether or not the other statute of limitations defense can go to the jury. Sure. I don't see how you can say because if he had, or if they had tried the case this way, there has to be some evidence. Was there evidence that in 2004 he told the doctor that he had an occupational illness? No. If you read the note, that's not what it says. Okay, what does it say? The note says that he came in for previously determined asthma, not occupational asthma, and that he was exposed to chemicals at work. That's all the note says. It doesn't even say that Mr. Solis said it. Well, why was he not a candidate for a respirator back in the late 90s? Wasn't that when that became apparent? No. What year was that? No. In fact, their material safety data sheet said no respiratory protection was needed, and in fact, no chronic health effects. I thought it had been determined in one of his workplaces that because of his lung condition, he was not capable of wearing a respirator at the point in time that he came to work at Flavor Chem because he was at 35%, but diacetyl was not a chemical that needed a respirator. That's why he was allowed to be working around it because the warning in the case was so inadequate in regard to that very chemical. So, yes, it's true that he was not respirator qualified, and so he was kept away from all of the chemicals that were thought to be causing respiratory illness. Diacetyl was not known to Flavor Chem to be one of those chemicals. What was he told then in 2004? How would you sum it up? Well, I think that Dr. Yadaba said it best. Dr. Yadaba was the treating physician who came to the conclusion in 2006 that he had bronchiolitis sublaterans and wrote an article and published it so that other practicing physicians would be able to diagnose this rare disease. None in Chicago were diagnosing it. And what he said was, I asked him this question, by July 16th of 2006, you hadn't decided what disease he really had or what was causing it. Am I right? Yes, I was working on it. Did Mr. Solis have more knowledge than you did at the time based on your discussions with him? In other words, did he know what was causing this and did he know what disease he had before you did? He said no, he didn't. Now, the reason why Dr. Yadaba was able to make that conclusion was very important. He and the Flavor Extract Manufacturers Association, Mr. Halligan's company who testified, who said that the BASF rat study triggered their knowledge, in fact sent a team to Flavor Chem from Denver and paid for it. Who said that, the doctor? Who said that their knowledge was triggered by the FDA? Mr. Halligan, the director of FEMA and the general counsel to RIFM. And they then instituted this industrial hygiene program to go look at all flavoring plants, including they looked at Flavor Chem where Mr. Solis worked, and that's how the doctors from National Jewish came in contact with Mr. Solis and finally told him in 2006, we think that you have bronchitis obliterans. He then went to National Jewish. Excuse me. When was it that he said something about being aware that he had an occupational disease? Mr. Solis never said that. In fact, he didn't think so. In fact, he was being told, you just have asthma. It's not being caused by your occupational pain. Yes. Doesn't the note by Dr. Sherman at least raise an issue of fact of what he knew, when he knew it, about whether his injury or his circumstance was an injury that was wrongfully caused? Doesn't that at least raise that as an issue of fact? And if so, obviously, then we have an issue of whether or not it would be appropriate to grant a summary judgment on that and take it away from the jury or the fact finder. I didn't come back to Mitzias, Judge, on this issue. Because, yes, if there were any testimony, and I mean any, that in 2004 it was discoverable by him. The reality is that if in fact the situation, you'll remember, better than I probably on Mitzias, where he was complaining about a cartilage injury to his shoulder, and he sued a doctor for medical malpractice, thinking it was the malpractice of the doctor that had caused his cartilage injury. And it wasn't until in the course of his own case, when his own expert testified in a deposition, that in fact the pain pump that had been installed was in fact the cause of his cartilage injury, that you said that that was new information to him that caused him to be able to realize... Indisputably new information to him. Indisputably new information to him. Correct. If there was a factual issue about whether that was new information, a contested issue of fact, we don't have the same results. We had no one who testified, Judge, that asthma was caused by the chemicals he was working with, and no one told him that. No one said that. That's a factual issue that was unexplored at the trial by a defendant, and I think they have to put on some evidence that it could be discovered. Well, how could they put it on a trial after the issue was decided at summary judgment? It was not decided at summary judgment. It was decided that she didn't submit it in terms of the statute of limitations instructions that were given. The only thing they tried to get in was Dr. Sherman's record, which in fact was admitted, but then none of their experts testified that he could have discovered bronchitis obliterans before 2006. In fact, they said he couldn't discover it today. Well, he doesn't have to discover that particular disease. No. Just that he was made sick? Well, Judge House, yeah. If someone had said those chemicals caused his asthma or could have caused his asthma, any link to a factual determination that the jury could have made. Did the note that didn't come in say he had an occupational disease? No, it said he has asthma. It was talking about an occupational disease. No, it says asthma. Plaintiff comes in complaining of preexisting asthma. From what? Nothing. It was undiagnosed as to what was causing his asthma. It was an unrelated situation that he came into the workplace with as far as they were telling him. He raised the question of chemicals in the workplace. They said that's how it's causing this problem. It wasn't until he was diagnosed correctly with bronchitis obliterans and the disclosure that diacetyl was being used in his workplace that the diagnosis was made by the doctors. And so you've got to ask yourself, if no doctor told him and no evidence of trial was that it could have been discovered, what evidence was there for the court to submit this instruction? That's what her dilemma was. It was a question about the way that the defendant chose to try the case. The only piece of evidence they tried to put in front of the jury was Dr. Sherman's note, which does not make that link between asthma and the chemicals. What does it say? The note says that he has asthma and that he asked the question about, I'm being exposed to chemicals at work. Is there any relationship? No one told him that was, and no one testified at trial that it was. In fact, he was allowed to be continued. Wait. What was the testimony? Let's move to this issue of causation. Okay. What was the testimony that was presented regarding the actual product being, that Mr. Solis was exposed to the product, the ASF? Yes. Judge, the evidence at trial was that between the years 2000 and 2004, in the powder room where he was working, 50% of the product was the ASF product. Are you referring now to Mr. Solis? I'm talking about Mr. Stolich's chart that he put into evidence. When you add it up, 50% of the product used in the powders was the ASF powder. Now, in the vanilla area, that was a different thing, but Mr. Solis was working in the powder room during that point in time. In terms of overall diacetyl supplied to flavor chem when he worked there, Dr. Eagleman said that that was about 3%. The doctor really wasn't in any position to quantify that, was he? It was unobjected to. Well, either way, was he in any position to quantify the doctor? It was a calculation based on the invoices. The doctor looked at it? Yes. So he looked at it. In making his medical judgment about substantial exposure, that BASF was a substantial factor in his disease process. And so what you had in that case was Dr. Eagleman testifying that he was exposed to thousands of gallons of BASF diacetyl, which I found to be a substantial factor in causing his disease. And if you look further and try to parse it out, as Mr. Stolich was saying, in regard to job classifications, in fact 50% of it, during the years 2000 and 2004, was being supplied by BASF. And that's important. I thought the doctors had conceded that they really didn't have any actual knowledge of the percentage. Well, Dr. Eagleman testified that it was about 3% of the total amount supplied. What Mr. Stolich was talking about is something different. They were saying they didn't know what the air samples in the area would have showed as opposed to the quantity being supplied to the plant. But we do have good evidence on that powder room, because National Jewish came in and tested in the powder room where he was working, where 50% of the BASF diacetyl was being supplied. And what they found in that powder room was that the levels of diacetyl found in that powder room were of the same magnitude as the workers that were working around the microwave popcorn mixing that were getting bronchitis obliterans. So we did have that measurement that was done by National Jewish in the powder room itself when they came to inspect when Mr. Stolich was working. So we do have that information. But also you have this information on your point, Judge McBride, about tying it causationally to this disease. During those years, 2000 to 2004, was the critical point in which Mr. Stolich experienced a precipitous decline from 35% to 25%. And that was the decline that Dr. Harmat pointed to, that said that was the critical disability-causing point, because at 35% he could do nearly everything that a normal person could do, including work. When you get down to 25%, you're looking at a lung transplant, he can't even walk. Did that doctor provide a testimony about his opinion as to the percentage as well? He testified that he thought that the BASF exposure was a substantial factor in this regard. I can't remember for sure whether he said the 3%. Dr. Eagleman, I do remember saying that, and I think we cited it in our brief. But he did believe that the BASF exposures were a substantial factor and so testified. So putting those things all together, I think we have a very different case than Thacker where Dr. Marks testified in the case that they cite that all exposures to asbestos cause disease, and he couldn't be more specific than that. We had much more than that here, and I think that it was adequate for the purposes of proving causation. In regard to this issue of warning the world, that was not what the court viewed her submission as being. In fact, she said at no point during the trial did this court instruct the jury to find in favor of the plaintiff if they thought BASF owed a duty to the world. Rather, the jury instructions involved in this lawsuit were appropriately tailored to the facts of this case. And the reason that she did, you know, Jeb Jackson, you asked the question, you know, what relationship did they have to the study? Well, we have direct evidence from Fern Lewis, who was the salesperson for BASF to Flavortown, who had the study in her hands in 2001. And she said she read it and decided not to pass it along to Flavortown. And she said there were two reasons for that. She said, number one, it was confidential, and number two, they didn't need to know about it. But when we asked Flavortown, Diane Hamernick, the person responsible for preparing the material safety data, she said it would have been considered and we would have changed our respiratory protection. Mr. Solis said that if, in fact, he had been instructed to wear a respirator, he would have done it. And so we have a very close link in regard to that evidence. But the court relied on Elam, which holds that that's the Weldonrod case that says that a manufacturer or supplier of a toxic material must go to the world's literature and find out what the relationship is between their product and any hazardous effects. She said this, there is certainly circumstantial evidence in the case that would dictate that BASF Corporation had a duty to find out all the information it possibly could having to deal with diacetyl by simply making a phone call to its parent corporation. And in that case, we had testimony, as I think Judge McBride was asking about, from the toxicologist at BASF Corp., the American company, that there was great interaction between the toxicologists and that the toxicologists in Germany never withheld anything that was requested by the American company. In addition, we showed that the material safety data sheets prepared by the American company were substantially different than the German corporation's. Did the trial court allow evidence that the German corporation's earlier study was imputable, if you will, to the defendant here? Yes, she did. Under what theory did she allow that? What was the theory? Well, it was direct testimony by the salesperson that said she had it. Fern Lewis had it in 2001, the very time period we're looking at when he was working in the powder room when his respiratory rate was declining so precipitously. She had the information, but someone, just separate corporate entities. Now, what was the theory behind her letting the jury infer that this was something that they were, that should have been imputed to them as well? Because the document was present. I'm not sure that she did say that it was imputed. She was going on the direct knowledge testified to by the employee that we read into evidence at trial. Fern Lewis, the salesperson, said she read it and didn't disclose it. So it wasn't imputing it at all. It was simply the witness testified she knew about it and decided not to tell them because it was confidential and they didn't need to know about it. When we presented it to Flavor Chem, they said, yeah, we needed to know about it, and we would have acted on it. So there was a link between those two things. But in addition, under ELIM, even if that hadn't existed as evidence in the case, I think that it would have been admissible because it was available to them and they could have known about it. Mr. Stolman points out they put the data on their material safety data sheet, so that means they had some information about it. That is, Cork put it on their material safety data sheet. So they had some information about it. Whether they had the study at any point before 2001, there was no testimony about that from them, and we couldn't discern that. But somebody had told them something about it in 2001. So if you talk about inquiry notice so-called, they were at least on inquiry. They were putting it on their material safety data sheet in terms of their raw data, not in terms of the findings. But the important point in that regard is that in regard to the German material safety data sheet found in their files, it says harmful by inhalation on their material safety data sheet. That warning was taken off of BASF Cork's material safety data sheet, going to the point when you say something is moderately toxic as opposed to harmful by inhalation, there's a difference. There's a difference, particularly when you couple their statement of moderately toxic with a statement that there are no known chronic health effects. Those are the things that Mr. Solis believed about this chemical. And so in sum, we don't think that there's any basis for J-O-V. If there is any basis for a new trial, which I sure hope that the court calls mischievous in this regard, in regard to this statute. I don't think anything we would decide would affect that case one way or another. If we want to insist on it, go ahead. These issues are not simply about statute of limitation, causation. There are multiple trial errors alleged in terms of what the jury heard. So this case doesn't just rise or fall on one claim, as you know. There are multiple errors alleged. In addition to the statute of limitation, there are multiple trial errors alleged. There are. The instructions as far as, you know, the post-remedial measures. The instruction regarding the claim, the 407 series. So, I mean, I'm just indicating that it isn't just about statute of limitation. At least that's not what I seem to get from this whole thing. No, there are clearly many errors alleged, although no specific claim about how that affected the jury's verdict is made, which I understand from reading the cases must be made in order for the court to reverse on any of these evidentiary errors or instructional errors. One of them is the causation issue, whether or not there was actually any testimony from anyone, any competent testimony as to the amount or whether or not Mr. Solis was actually exposed to the chemical distributed by BASF. That is one of their primary arguments. In addition to the statute. Yes, absolutely. And we have the testimony of at least four doctors, including his treating physician, who wrote an article that that was the cause. And Mr. Solis himself testified. I don't mean causation in the sense that chemical caused the disease. Causation that the actual chemical distributed by BASF was actually the chemicals that made him ill.  That's their argument. I know it is. Not that it was simply a matter of causation. And I come back to Judge Epstein's question in this regard, is that if, in fact, when you're working with material and you're working with a large quantity of the material and you know it's that company's quantity and you can chart a decline during the time period that he's working with it, if that's not at least circumstantial evidence of a cause and effect from that exposure, I guess how would you ever prove it? Well, was BASF the only distributor at that point? Is that what you're saying? No, I'm saying that it was 50%. It was the 50% distributor between 2000 and 2004 in the powder room. And that was based on? Mr. Solis' calculation. It was based on Mr. Solis' calculation, but it was... They wrote down a note? No, no, it wasn't. It wasn't at a council table? No, it wasn't. Mr. Skolnik actually gave him the document. It was overnight. Mr. Solis asked for the document that Mr. Skolnik was using. Mr. Skolnik gave it to him. Did you have any testimony from anyone calling BASF in terms of adverse witnesses to establish this number? No, we accepted their invoices in terms of the amount, and the amount is 50%. You can do the calculations and evidence. The amount is 50%. Mr. Solis didn't need to testify about it. 50% of the amount that went into the powder room during the 2000-2004 time period is BASF diastolic. It wasn't magic, and it wasn't improper. Mr. Skolnik gave him the chart. And so it wasn't my question that asked it. He asked him on cross-examination. It came out totally as a matter of something that happens during trial when somebody asks a question of a witness that they don't know the answer to. And Mr. Solis answered the question. And he didn't move to strike it. The court allowed it because it was a proper answer. So the reality is I think that we have met every test in regard to a very complicated case. I think that the court ruled correctly on these evidentiary issues. But even if she didn't, the ones that they point to cannot be viewed to be determinative of the outcome of the case. And so we would ask the court to deny the JNOV and to deny a new trial. But if a new trial is granted, we would at least ask the court to consider our point that the damages are not appealed from in this case. And they're not intertwined. And, in fact, in the two cases that we say- And why are they not intertwined? Well, because there was no testimony which demonstrated that the jury was inflamed or in any way- Well, that inflamed has nothing to do with whether the issues are intertwined. Well, if you look at the two cases that we cite- What about the percentage of liability? The percentage of liability would not be affected by a statute of limitations perhaps. No. But some of the other perceived errors might well affect that. Well, what might they be, Judge? I'm not thinking about them. If you have some in mind, I can't think of what they would be. I mean, other than- I just can't think of what he did that would increase that she excluded from evidence. She didn't exclude anything in terms of his conduct. The only thing that was not done was there was no statute of limitations instruction given to the jury because there was no evidence that they presented that this was knowable beforehand. And, in fact, their witnesses testified. And the court's very clear about that in her order. Their witnesses testified it wasn't knowable. And so it was a complete failure of proof on this affirmative defense that the defendant had. And so when you don't present evidence on your main theory of defense, what's the court going to do? The reality was that the one document that they wanted to put in was put in, but it doesn't establish the point that they had. In fact, the testimony was completely opposite that, that this was not discoverable to him in 2004. So, if you set it back, I don't think that the verdict- I would say two cases. Borchak is one, and I'm drawing a blank in regard to the other. I have it here, though. Mark, let me find it so that the court will- I think it's at page 38 of our brief, if I remember it correctly. If it comes to that, we'll obviously be rereading the briefs. We spent a substantial amount of time reading them before this argument. But Borchak, in fact, talked about an assumption of the risk defense, which would be more in keeping with what you were thinking, that couldn't it impact the allocation of faults? And Borchak said, even in a case involving assumption of the risk, that since they didn't challenge anything on damages, they weren't intertwined, and set it back for a new trial on liability only. So, we think that you certainly have the power to do that, not to recreate the wheel in regard to this case. But we think that, taken as a whole, the case was properly tried, the judge correctly ruled, and submitted the case to the jury. And so, we appreciate very much the court's consideration of this matter. Thank you very much, Mr. McLean. Mr. Sloman, your final words, please. Just very briefly. I'd like to refer the court to the evidence that we submitted on the question of statute of limitations. It's pages 30 and 31 of our brief. It talks about not only Dr. Sherman, but it talks about a questionnaire that was filled out with respect to the National Jewish Hospital visit. And that reference is at the top of page 31 of our opening brief. The evidence is there. Regardless of how appellee may characterize it, it's there. Let me just talk for a second, if I might, about the causation issue. Because while counsel has raised the name of the Thacker case, I think that they'd like to try and run away from the Thacker case. We are not, under any circumstance, suggesting an impossible burden for the plaintiff. In fact, the plaintiff would like to shift the burden to us. Because when the plaintiff says any and every exposure is a substantial factor, that shifts the burden over to us to try to disprove causation. The burden squarely lies, according to the Supreme Court, clearly lies and always lies with the plaintiff to prove causation. The presence of a substance, the presence of the plaintiff, and the fact that the plaintiff got sick is not enough. And that's what the proof is in this case. With the opinion testimony of the experts that links up the damage to the presence of the defendant and the presence of the substance and the plaintiff's injury, the nature of the injury. You're arguing, really, as if there wasn't expert testimony which the jury was entitled to consider. Well, the expert testimony, Your Honor, is that those three things, presence of the plaintiff, presence of the substance and disease, get you there, create causation. Let's read what Dr. Eagleman said. Dr. Eagleman, this is on cross-examination. Now, is there any way that you can determine what concentration of BASF Corporation diastole Mr. Solis was exposed to when he worked at Flabergen? Answer from Dr. Eagleman, no. Can you tell us on an average day how much BASF Corporation diastole Mr. Solis was exposed to? Answer, no. Can you tell us whether or not he was ever actually exposed to BASF Corporation diastole when he worked at Flabergen? Answer, I think yes. And the reason you say that is because Flabergen bought from BASF Corporation and Mr. Solis worked in the facility. Answer, and he worked with diastole, yes. Question, but you don't know on any given day whether he actually worked with BASF Corporation diastole. Answer, that's correct. On a given day. Pardon me? On a given day. On any day. On any day. On a given day or any day. You said on any given day. That's correct. That's the question which I assume you posed. I did. And he said he can never tell you whether Mr. Solis was exposed to BASF Corporation diastole. But wasn't there testimony that 50% of the powder that was in that room was BASF? Let's talk about the 50% issue. Mr. McClain says, I gave Mr. Solis the document and he looked at the document. I think the document he's talking about is the flavor chem chart of what was made on particular days and whose diastole was used to make that. I don't think it says in there. I may be wrong. Maybe I didn't calculate it, but I put calculations in based on what information I had in our brief. I don't see 50%. The 50% that I think is the damning 50% is the piece of information that Mr. Solis talked about when he calculated this from some document that appeared on the table and he pulled out his back pocket calculations. That to me is not evidence of 50% exposure. In fact, I don't think there could be, given the sales numbers here, I don't think there's ever a period of time when BASF Corporation diastole constitutes 50% of what's in the room. But the record, I think, bears me out on that. On the causation, Thacker says what it says. Thacker says there has to be proximity, frequency, and regularity, and those things haven't been established. They weren't established before the trial. They weren't established during the trial. And that is the causation issue that they want to run away from and have run away from by Dr. Eagleman saying, trying to turn the clock back, essentially, to a period of time when Mr. Solis wasn't even working in a facility that used BASF Corporation diastole. With that, Your Honor, I would conclude my remarks unless there are any additional questions. Thank you very much. And to both of you, Solis, thank you for a very fine presentation, both orally and through your briefs. Obviously, we've considered it a great deal before today and we're going to consider it some more. We'll issue a ruling in due course. We're adjourned.